IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

MARVIN MITCHELL

Plaintiff,

v.

NORTHWEST PIPE COMPANY,

Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff Marvin Mitchell ("Mitchell"), for his Complaint, states as follows:

### I.   JURISDICTION AND VENUE

1.   This action is authorized and the jurisdiction of this Court is invoked pursuant to 42 U.S.C. §2000e-5(f).

2.   Venue is proper in this Court as the unlawful employment practices alleged herein were committed within the jurisdiction of the United States District Court for the District of Colorado.

### II.   PARTIES

3.   Mitchell is a African-American male citizen of the United States over the age of 40 and a resident of, and domiciled in, the State of Colorado.

4. Defendant Northwest Pipe, LLC ("Northwest") is an Oregon corporation, authorized to conduct business within the State of Colorado as a manufacturer of welded steel pipe and having a manufacturing plant located at 6030 North Washington Street, Denver, CO.

5. Northwest currently employees over 20 employees.

### III.   ADMINISTRATIVE PROCEDURES

6. Within 300 days of the occurrence of the acts complained of below, Mitchell filed a Charge of Discrimination with the Equal Employment Opportunity Commission claiming that he was discriminated against on the basis of race and in retaliation for engaging in a protected activity.

7. On or about April 3, 2014, Mitchell received a "Notice of Right to Sue" from the EEOC, dated April 2, 2014.

### IV.   FACTUAL ALLEGATIONS

8. Mitchell began employment with Northwest in April 2011, through a temp agency, as a fabricator.

9. At the time of his hiring through the temp agency, Mitchell was informed by Todd in Human Resources that Northwest would be hiring nightshift welders in the fabrication department within a few weeks and asked Mitchell if he would be interested in the position.

10. Mitchell informed Todd that he indeed would be interested in being directly hired by Northwest.

11. Although Mitchell was told by Todd that he would be hired directly by Northwest within two weeks, the night time supervisor Cameron did not process Mitchell's paper work for direct hiring until four months later.

12. During that same time period, four (4) other temp workers, including Tanner, Ruben, David and Jose, who are not African-American, were hired with two (2) months of their temporary employment.

13. When Mitchell began full-time employment with Northwest, he was immediately successful, completing an average of 6-10 pipes a night.

14. Mitchell's supervisors then began to give him all of the worse pipe that were filled with defects and giving the other non-African-American workers the "sweepers" or easier pipes without any defects, causing Mitchell to not be able to meet his quotas.

15. When Mitchell complained about his receiving all of the defective pipe, he was told that he should do his job and not complain.

16. In August 2011, Mitchell went to his work station and found that a stick man hanging from a noose had been drawn on the pipe he was working, along with a Nazi symbol and indiscernible writing.

17. The writing on the pipe was witnessed by coworkers James, Richard Moreno, Tanner, Ruben, Kirk McKee and Aaron.

18. Mitchell immediately reported the graffiti to his supervisor Ignacio and informed him that he was severely offended by the racist graffiti.

19. Ignacio reported the graffiti to Supervisor Cameron who laughed and asked Mitchell if he knew who drew the graffiti.

20. Mitchell informed Cameron that he did not know who was responsible and Cameron informed him that he would conduct an immediate and thorough investigation.

21. When Mitchell subsequently asked Cameron about the progress of the investigation, Cameron informed Mitchell that he was too busy and nothing was ever done to conduct such an investigation.

22. In September 2011, Mitchell returned to his locker after a safety meeting and found human feces on top of the locker.

23. Mitchell immediately went to inform his supervisor Cameron of the situation, however Cameron laughed at Mitchell and refused to believe that this had occurred.

24. When Cameron finally went to Mitchell's locker and found the feces, he asked Mitchell "what do you want me to do about it" and told him to clean it up and return to work.

25. No investigation was ever initiated regarding the feces.

26. At the end of October, beginning of November 2011, the team was given other assignments.

27. Mitchell, Moreno and McKee were assigned the worse jobs, including scrubbing and painting over spit and chewing tobacco walls and floors with hand rags.

28. Other, none African-American employees were assigned light duty during this period.

29. Mitchell went to his lead Ignacio and informed him that he believed he was being singled out and others were being favored in the work assignments.

30. Ignacio immediately began to scream at Mitchell and went to get Cameron who also began to scream at Mitchell in front of the other workers.

31. Mitchell informed Cameron that he had endured enough abuse and was going home for the day but would return the next day to talk to Todd in Human Resources.

32. The next day, as Mitchell attempted to locate Todd, Cameron and Ignacio constantly monitored his movements and Mitchell was never able to report the incident in confidence to Human Resources.

33. In mid-November 2011 Mitchell informed Cameron, Ignacio, Human Resources Manager Todd and the Operations Manager John that he had incurred an injury to his eyes due to flash burns as the result of a defective welding screen and needed to seek medical attention.

34. Cameron went to speak to his supervisor and returned to tell Mitchell that the supervisor did not want to have an accident reported due to his concerns for the plant's safety record and that Mitchell should simply return to work.

35. When Mitchell requested permission from Defendant to seek medical treatment from his own doctor, using his own insurance, Mitchell was told that if sought such treatment, he would not have a job the next day.

36. Prior to this incident with Mitchell, an Hispanic worker, who also works at Northwest, had an eye injury due to flash burns and immediately received medical treatment.

37. In January 2012, Mitchell was given a performance evaluation in which he received high marks for his work, but was given a negative score for having a "negative attitude" towards Northwest and its management and he refused to sign the evaluation.

38. Later in January 2012, Mitchell asked Cameron why he couldn't use one of his floating days-off for Martin Luther King Day.

39. Cameron informed Mitchell that Northwest "does not celebrate nigger day".

40 Mitchell was offended by the comment, however based upon the lack of any investigation into prior offenses, he did not report this incident to Human Resources, but rather, he reported it to his coworker Moreno who advised Mitchell to go to Human Resources.

41. Several days after this incident, Mitchell was called into John's office and told that he had heard a rumor that Mitchell had threatened someone in the hydro department.

42. Mitchell informed John that he had never made such threat and asked for the identity of the accuser, but was never informed as to the substance of the threat, when it was allegedly made, nor to whom such threat was alleged made.

43. Mitchell was told to go home so that John could conduct an investigation, however Northwest never conducted an investigation as they never even spoke to the people that worked closest with Mitchell.

44. Mitchell was subsequently suspended for the alleged threat.

45. While on suspension, Mitchell notified the EEOC of what was occurring at Northwest and reported his contact to Todd from Human Resources.

46. Five days later, Todd contacted Mitchell and informed him that Northwest was terminating his employment, January 23, 2012.

## FIRST CAUSE OF ACTION
## DISCRIMINATION

47. Mitchell incorporates by reference his factual allegations.

48. Plaintiff Mitchell, as an African-American is a member of a protected class.

49. During the term of his employment, Mitchell was performing his job duties in a satisfactory manner.

50. Mitchell was subjected to racial slurs and acts which were perpetrated and known by his supervisor, but were not acted upon by the Defendant.

51. Mitchell was treated differently than similarly situated non-African American employees.

52. Defendant engaged in unlawful employment practices in violation of 42 U.S.C. § 2000e-2(a)(1).

53. Defendant's actions in treating Mitchell differently than similarly situated non-African-Americans, was in violation of 42 U.S.C. § 2000e.

54. The effect of the practices complained of was to deprive Mitchell of equal employment opportunities and to otherwise adversely affect his status as an employee, based upon his race.

55. The unlawful employment practices complained of above were the intentional acts of Defendant's managers and Defendant had actual knowledge of the discrimination and harassment due to Plaintiff's complaints.

56. Defendant took no remedial action to stop the discrimination and disparate treatment and thereby, allowed a hostile, intimidating and offensive work environment to persist, which culminated in Mitchell's wrongful termination.

57. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered past and future wage loss, emotional distress, inconvenience, mental anguish and other non-pecuniary losses.

## SECOND CAUSE OF ACTION
## RETALIATION

58. Mitchell incorporates by reference his prior factual allegations and causes of action.

59. Plaintiff engaged in a protected activity when he complained of racial harassment and discrimination to Defendant.

60. As a result of his complaints, Defendant retaliated against Mitchell by engaging in the unlawful employment practices described above in violation of 42 U.S.C. § 2000-e2(a)(1).

61. The final act of retaliation was terminating Mitchell's employment based upon the unsubstantiated allegation that Mitchell had threatened someone, without even conducting an actual investigation.

62. The effect of the practices complained of above was to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee based upon his prior complaints.

63. Defendant has engaged in a pattern and practice of retaliating against employees who engage in protected activities by objecting to illegal discrimination.

64. The unlawful employment practices complained of above were the intentional acts of Defendant and occurred with the direct knowledge of Defendant of the retaliation.

8

65. Defendant took no remedial action to stop the retaliation which created an intimidating, hostile and offensive work environment and, ultimately led to Plaintiff's unlawful constructive discharge.

66. As a direct and proximate result of Defendant's retaliation against Plaintiff, he has and will continue to incur past and future wage loss, emotional distress, inconvenience, embarrassment, mental anguish and other nonpecuniary losses.

**WHEREFORE,** Plaintiff Marvin Mitchell respectfully requests that this Court enter judgment in his favor and against the Defendant Northwest Pipe Company, and award him all relief as allowed by law, including but not limited to, the following:

a. Actual economic damages as established at trial;

b. Compensatory damages including, but not limited to, those for future pecuniary losses, emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

c. Punitive damages for all claims allowed by law in an amount to be determined at trial;

d. Pre-judgment and post-judgment interest at the legal rate;

e. Attorney's fees and costs; and

f. Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

**DATED** this 20th day of June 2014.

        **SCOTT F. REESE, P.C.**

        **S/ Scott F. Reese**
        Scott F. Reese
        795 W. Birch Ct., Suite 100
        Louisville, CO 80027
        (303) 665-4448

        **Attorney for Plaintiff**

Plaintiff's Address:
 301 Malley Drive
Apt 124
Northglenn, CO 80233

10